**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TGG ULTIMATE HOLDINGS, INC., TGG HOLDINGS, INC. TGG SUB INC., and THE GORDIAN GROUP, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH HOLLETT, JOHN LEDEZMA, LAURA ROMERO and MARTIN GARCIA,<br><br>Defendants. | CIVIL ACTION NO.<br><br>**VERIFIED COMPLAINT FOR (i) INJUNCTIVE RELIEF, (ii) DECLARATORY RELIEF, (iii) COMPENSATORY DAMAGES, (iv) STATUTORY DAMAGES, (v) PUNITIVE DAMAGES, (vi) TREBLE DAMAGES and (vii) RELATED RELIEF** |

Plaintiffs TGG Ultimate Holdings, Inc. (hereinafter "TGG Ultimate"), TGG Holdings, Inc. (hereinafter "TGG Holdings") TGG Sub Inc. (hereinafter "TGG Sub"), and The Gordian Group, Inc. (hereinafter "The Gordian Group") (collectively, "Plaintiffs"), by their undersigned attorneys, for their Complaint against Defendants Joseph Hollett (hereinafter "Hollett"), John Ledezma (hereinafter "Ledezma"), Laura Romero (hereinafter "Romero") and Martin Garcia (hereinafter "Garcia") (collectively "Defendants"),state as follows:

**PRELIMINARY STATEMENT**

1. Plaintiffs seek the immediate assistance of this Court to enjoin Defendants, their former employees and officers, from violating their contractual post-employment obligations and competing with and soliciting other employees from The Gordian Group, as well as other relief as set forth in this Complaint.

## PARTIES

2. Plaintiff TGG Ultimate Holdings, Inc. is a corporation organized in accordance with the laws of the State of Delaware with its principal place of business located at 30 Patewood Drive, Suite 350, Greenville, SC 29615.

3. Plaintiff TGG Holdings, Inc. is a corporation organized in accordance with the laws of the State of Delaware with its principal place of business located at 30 Patewood Drive, Suite 350, Greenville, SC 29615.

4. Plaintiff TGG Sub Inc. is a corporation organized in accordance with the laws of the State of Delaware with its principal place of business located at 30 Patewood Drive, Suite 350, Greenville, SC 29615.

5. Plaintiff The Gordian Group, Inc. is a corporation organized in accordance with the laws of the State of Georgia with its principal place of business located at 30 Patewood Drive, Suite 350, Greenville, SC 29615.

6. TGG Sub Inc. is the holding company of The Gordian Group; TGG Holdings, Inc. is the holding company of TGG Sub Inc.; and TGG Ultimate Holdings, Inc. is the holding company of TGG Holdings, Inc.

7. At all times material hereto, the Defendants were employed directly by The Gordian Group.

8. Defendant Joseph Hollett is a former employee of The Gordian Group and, upon information and belief, a resident and citizen of the State of California with a residential address of 551 Silver Shadow Drive, San Marcos, CA 92078.

9. Defendant John Ledezma is a former employee of The Gordian Group and, upon information and belief, a resident and citizen of the State of California with a residential address of 1710 253rd Street, Lomita, CA 90717.

10. Defendant Laura Romero is a former employee of The Gordian Group and, upon information and belief, a resident and citizen of the State of California with a residential address of 1827 E. Michelle Street, West Covina, CA 91791.

11. Defendant Martin Garcia is a former employee of The Gordian Group and, upon information and belief, a resident and citizen of the State of California with a residential address of 1100 South Neff Avenue, West Covina, CA 91790.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

13. In addition, Defendants agreed, by contract, to submit to the exclusive jurisdiction of Courts within the State of New York. *See* Exhibits A-D.

14. Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(2) because the Parties agreed, by contract, that the exclusive venue of all disputes was the State of New York. *Id.*

**FACTS COMMON TO ALL COUNTS**

**I. ABOUT THE GORDIAN GROUP**

15. The Gordian Group is in the business of offering "job ordering contracting," a combination of products and services that provides public agencies an expedited means to procure and accomplish various types of construction projects.

16. "Job ordering contracting" streamlines the bid process for construction companies and public agencies by, among other things, utilizing a single competitive bid process to accomplish a wide range of construction tasks included in a unit price book that is part of the initial bid package for a job order contract.

17. The Gordian Group provides all of the relevant construction cost data, software and services needed to successfully execute a job order contracting program.

18. As part of its business, The Gordian Group employs and profits from a host of confidential and proprietary information, including, without limitation, its customer and prospects lists, product development, its construction cost data, proprietary software, and its methods of procuring construction services and materials.

19. The Gordian Group compiles thousands of construction tasks using locally priced construction costs for labor, material and equipment costs related to each region of the country in which it offers these services.

20. The methods of compilation and use of the construction cost data are proprietary, as are The Gordian Group's lists of customers and prospective customers, as well as the customer data generated within the proprietary software.

21. The Gordian Group's proprietary compilations and use of construction cost data, its proprietary software, as well as its customers and prospective customers, are its most valuable assets.

22. The Gordian Group goes to great lengths to protect its information and customers because it would suffer catastrophic and irreparable damages if its proprietary information were disclosed and used to interfere with its business interests.

## II. THE GORDIAN GROUP HIRES JOSEPH HOLLETT, AND HE AGREES TO POST-EMPLOYMENT RESTRICTIONS

23. On or about June 1, 1995, The Gordian Group hired Hollett to the position of Senior Project Manager. By the end of his tenure at The Gordian Group, Hollett had the title, "Region Director, Pacific South Region."

24. In connection with the purchase of TGG Sub, and as a condition of his receipt of $437,734.94 to be paid in connection with TGG Holdings' purchase of TGG Sub, Hollett entered into a series of agreements that, among other things, protected The Gordian Group's confidential information to which Hollett was made privy, and imposed restrictions on Hollett's ability to compete with The Gordian Group and its affiliated entities and solicit The Gordian Group's customers, prospects, and employees during and following his employment.

25. On or about March 28, 2012, in consideration for receipt of the payment set forth in the above paragraph, Hollett executed a "Non-Competition, Non-Solicitation, Non-Hire and Confidentiality Agreement" (the "Hollett Non-Compete Agreement"). The Hollett Non-Compete Agreement is attached hereto as Exhibit A.

26. Among other things, Hollett agreed, by way of the Hollett Non-Compete Agreement, that he would (i) preserve the confidentiality of The Gordian Group's information; (ii) refrain from competing with The Gordian Group for a seven-year period; (iv) refrain from soliciting customers and employees of The Gordian Group for a seven-year period; (v) refrain from interfering with any of The Gordian Group's business relationships; (vi) and agree to submit to the jurisdiction of the Courts of New York.

27. Specifically, the Hollett Non-Compete Agreement provides, in pertinent part, as follows:

> *1(c). "Term" means the period commencing on the date of this Agreement and ending on the 7 year anniversary of the date of this Agreement; provided, however, that if the Restricted Party's employment with the Company or any of its Subsidiaries is terminated (i) by the Company or any of its Subsidiaries without Cause, or (ii) by the Restricted Party with Good Reason, then the "Term" shall mean the period commencing on the date of this Agreement and ending on the 4 year anniversary of the date of this Agreement.*

###

> 2. *Non-Competition, Non-Solicitation and Non-Hire Covenants.*
>
> *(a) During the Term, no Restricted Party shall, directly or indirectly (1) own any interest in, manage, control, participate in (whether as an officer, director, employee, partner, agent, consultant, representative or otherwise), (ii) render services to any Person or (iii) in any manner engage in any activity or enterprise, in either case, competing with the Business in the Restricted Territory...*
>
> *(b) During the Term, no Restricted Party shall, directly or indirectly, do any of the following: (i) solicit the employment of any employee of TGG Sub or any of its Subsidiaries as of the date of this Agreement (after giving effect to the consummation of the Acquisition) or any employee who was employed by TGG Sub or any of the Subsidiaries for any type of employment within the six-month period prior to the date of this Agreement...*
>
> *(c) Each Restricted Party acknowledges and agrees that: (1) the Business has been and shall be conducted in the Restricted Territory; (2) as applicable, such Restricted Party's (A) knowledge of TGG Sub's and its Subsidiaries' operations and the Business, (B) rendering of services in the Business as a director, manager, officer, employee, equityholder or consultant of TGG Sub or any of its Subsidiaries, (C) financial resources and (D) customer contacts in the Business would permit such Restricted Party, but for the non-compete, non-solicitation, non-hire and confidentiality covenants in this Agreement, to unfairly compete with the Business; and, (3) the geographical restrictions and the length of the non-competition; non-solicitation and non-hire periods are reasonable and narrowly drawn to impose no greater restraint than is necessary to protect the goodwill of TGG Sub and its Subsidiaries (after giving effect to the consummation of the Acquisition).*
>
> 3. *Confidential Information. From and after the date of this Agreement, each Restricted Party agrees not to disclose or use at any time (and to cause each of its Affiliates not to use or disclose at any time) any confidential or proprietary information of TGG Sub, TGG and its Subsidiaries, except for disclosures made in the course of any Action arising under in connection with the Purchase Agreement or any other Transaction Document or the transactions contemplated thereby. Subject to the foregoing, each Restricted Party further agrees to take all commercially reasonable steps (and to cause each of its Affiliates to take all commercially reasonable steps) to safeguard such information so*

> *disclosed and to protect it against unauthorized disclosure, misuse, espionage, loss and theft...*
>
> ###
>
> *4. (a) Remedies. In the event of a breach of this Agreement by the applicable Restricted Party, Buyer shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations hereunder, without the necessity of posting a bond or other security. Without limiting the generality of the foregoing, Buyer and its Subsidiaries shall have the following rights and remedies against the applicable Restricted Party, each of which shall be independent of the others and severally enforceable: the right and remedy to have the restrictive covenants in the Agreement specifically enforced against the applicable Restricted Party, it being agreed by each Restricted Party that any breach or threatened breach by a Restricted Party of this Agreement may cause irreparable injury to each of Buyer or any of its Subsidiaries and that money damages may not provide an adequate remedy to Buyer or any of its Subsidiaries.*

*See* Exhibit A.

## III. HOLLETT GAINS ACCESS TO CONFIDENTIAL AND PROPRIETARY INFORMATION

28. In his role as an employee of The Gordian Group and Regional Director of the Pacific South Region, Hollett was privy to The Gordian Group's customer list and had direct interaction with a number of The Gordian Group customers.

29. In fact, Hollett regularly received an updated list of all The Gordian Group's customers and prospects to aid in his role of selling to, and providing services and products to, these businesses.

30. Hollett also had access to The Gordian Group's proprietary and confidential sales and services materials meant to help The Gordian Group sell its products and to market its services.

31. In addition, Hollett received and used The Gordian Group's sales and other proprietary materials designed to educate customers and prospective customers on The Gordian Group's products and services.

32. Together, the customer lists, confidential/proprietary information, know-how, techniques, discoveries, inventions, developments, data, designs, improvements, formulas, manufacturing processes, customers, clients and supplier lists, customer and client information, pricing information, computer technology, information and software, and business, marketing or sales policies, procedures and other financial and business information (collectively, "trade secrets") to which Hollett was privy during his employment are trade secrets from which The Gordian Group derives value.

## IV. HOLLETT TERMINATES HIS EMPLOYMENT WITH THE GORDIAN GROUP

33. On or about February 28, 2013, Hollett voluntarily terminated his employment with The Gordian Group.

34. Hollett represented to The Gordian Group upon terminating his employment that he would not be competing with, soliciting employees from or taking the proprietary information of The Gordian Group.

35. Hollett also represented to The Gordian Group upon terminating his employment that he would be working in the medical space and not in any way competing with the job order contracting services and products offered by The Gordian Group.

## V. THE GORDIAN GROUP HIRES JOHN LEDEZMA, AND HE AGREES TO POST-EMPLOYMENT RESTRICTIONS

36. On or about May 12, 2005, The Gordian Group hired Ledezma to work as an employee with the title, "Account Manager."

37. In October 2012, The Gordian Group employees were given the opportunity to purchase shares in TGG Ultimate Holdings by rolling over cash bonus payments due to the employees in connection with the sale of TGG Sub to TGG Holdings. In connection with, and as a condition of, the opportunity to purchase shares in TGG Ultimate Holdings, Ledezma entered into a series of agreements that, among other things, protected The Gordian Group's confidential information to which Ledezma was made privy and imposed restrictions on Ledezma's ability to compete with The Gordian Group, and its affiliated entities, and to solicit The Gordian Group's customers, prospects, and employees during and following his employment.

38. On or about October 30, 2012, Ledezma executed a "Non-Competition, Non-Solicitation, Non-Hire and Confidentiality Agreement" (the "Ledezma Non-Compete Agreement"). The Ledezma Non-Compete Agreement is attached hereto as Exhibit B.

39. In consideration for signing the Non-Compete Agreement, Ledezma was given the option, and exercised such option,to purchase stock in a private company in which he otherwise would not have been able to purchase stock.

40. Among other things, Ledezma agreed, by way of the Ledezma Non-Compete Agreement, he would (i) preserve the confidentiality of The Gordian Group's information; (ii) refrain from competing with The Gordian Group for a seven-year period; (iv) refrain from soliciting customers and employees of The Gordian Group for a seven-year period; (v) refrain from interfering with any of The Gordian Group's business relationship; (vi) and agree to submit to the jurisdiction of the Courts of New York.

41. Specifically, the Ledezma Non-Compete Agreement provides, in pertinent part, as follows:

> *1(c). "Term" means the period commencing on the date of this Agreement and ending on the 7 year anniversary of the date of this*

*Agreement; provided, however, that if the Restricted Party's employment with the Company or any of its Subsidiaries is terminated (i) by the Company or any of its Subsidiaries without Cause, or (ii) by the Restricted Party with Good Reason, then the "Term" shall mean the period commencing on the date of this Agreement and ending on the 4 year anniversary of the date of this Agreement.*

###

*2. Non-Competition, Non-Solicitation and Non-Hire Covenants.*

*(a) During the Term, no Restricted Party shall, directly or indirectly (1) own any interest in, manage, control, participate in (whether as an officer, director, employee, partner, agent, consultant, representative or otherwise), (ii) render services to any Person or (iii) in any manner engage in any activity or enterprise, in either case, competing with the Business in the Restricted Territory...*

*(b) During the Term, no Restricted Party shall, directly or indirectly, do any of the following: (i) solicit the employment of any employee of TGG Sub or any of its Subsidiaries as of the date of this Agreement (after giving effect to the consummation of the Acquisition) or any employee who was employed by TGG Sub or any of the Subsidiaries for any type of employment within the six-month period prior to the date of this Agreement...*

*(c) Each Restricted Party acknowledges and agrees that: (1) the Business has been and shall be conducted in the Restricted Territory; (2) as applicable, such Restricted Party's (A) knowledge of TGG Sub's and its Subsidiaries' operations and the Business, (B) rendering of services in the Business as a director, manager, officer, employee, equityholder or consultant of TGG Sub or any of its Subsidiaries, (C) financial resources and (D) customer contacts in the Business would permit such Restricted Party, but for the non-compete, non-solicitation, non-hire and confidentiality covenants in this Agreement, to unfairly compete with the Business; and, (3) the geographical restrictions and the length of the non-competition; non-solicitation and non-hire periods are reasonable and narrowly drawn to impose no greater restraint than is necessary to protect the goodwill of TGG Sub and its Subsidiaries (after giving effect to the consummation of the Acquisition).*

> *3. <u>Confidential Information</u>. From and after the date of this Agreement, each Restricted Party agrees not to disclose or use at any time (and to cause each of its Affiliates not to use or disclose at any time) any confidential or proprietary information of TGG Sub, TGGand its Subsidiaries, except for disclosures made in the course of any Action arising under in connection with the Purchase Agreement or any other Transaction Document or the transactions contemplated thereby. Subject to the foregoing, each Restricted Party further agrees to take all commercially reasonable steps (and to cause each of its Affiliates to take all commercially reasonable steps) to safeguard such information so disclosed and to protect it against unauthorized disclosure, misuse, espionage, loss and theft...*
>
> ###
>
> *4. (a) <u>Remedies.</u> In the event of a breach of this Agreement by the applicable Restricted Party, TGG Ultimate shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations hereunder, without the necessity of posting a bond or other security. Without limiting the generality of the foregoing, TGG Ultimate and its Subsidiaries shall have the following rights and remedies against the applicable Restricted Party, each of which shall be independent of the others and severally enforceable: the right and remedy to have the restrictive covenants in the Agreement specifically enforced against the applicable Restricted Party, it being agreed by each Restricted Party that any breach or threatened breach by a Restricted Party of this Agreement may cause irreparable injury to each of TGG Ultimate or any of its Subsidiaries and that money damages may not provide an adequate remedy to TGG Ultimate or any of its Subsidiaries.*

*See* Exhibit B.

## VI. LEDEZMA GAINS ACCESS TO CONFIDENTIAL AND PROPRIETARY INFORMATION

42. In his role as an Account Manager, Ledezma was privy to The Gordian Group's customer list.

43. In fact, Ledezma regularly received an updated list of all The Gordian Group's customers and prospects to aid in his role of selling to, and providing services and products to, these businesses.

44. Ledezma also had access to The Gordian Group's proprietary and confidential sales and services materials meant to help The Gordian Group sell its products and to market its services.

45. In addition, Ledezma received and used The Gordian Group's sales and other proprietary materials designed to educate customers and prospective customers on The Gordian Group's products and services.

46. The trade secrets to which Ledezma was privy during his employment are trade secrets from which The Gordian Group derives value.

## VII. LEDEZMA'S EMPLOYMENT WITH THE GORDIAN GROUP TERMINATED

47. On or about November 12, 2015, Ledezma's employment was terminated.

48. Prior to this termination, Ledezma represented through various agreements that he would not be competing with, soliciting employees from or taking the proprietary information of The Gordian Group.

## VIII. THE GORDIAN GROUP HIRES LAURA ROMERO, AND SHE AGREES TO POST-EMPLOYMENT RESTRICTIONS

49. On or about September 1, 2008, The Gordian Group hired Romero to work as an employee with the title, "Account Manager."

50. In October 2012, The Gordian Group employees were given the opportunity to purchase shares in TGG Ultimate Holdings by rolling over cash bonus payments due to the employees in connection with the sale of TGG Sub to TGG Holdings. In connection with, and as a condition of, the opportunity to purchase shares in TGG Ultimate Holdings, Romero entered

into a series of agreements that, among other things, protected The Gordian Group's confidential information to which Romero was made privy and imposed restrictions on Romero's ability to compete with The Gordian Group, and its affiliated entities, and to solicit The Gordian Group's customers, prospects, and employees during and following her employment.

51. On or about October 30, 2012, Romero executed a "Non-Competition, Non-Solicitation, Non-Hire and Confidentiality Agreement" (the "Romero Non-Compete Agreement"). The Romero Non-Compete Agreement is attached hereto as Exhibit C.

52. In consideration for signing the Non-Compete Agreement, Romero was given the option, and exercised such option, to purchase stock in a private company in which she otherwise would not have been able to purchase stock.

53. Among other things, Romero agreed, by way of the Romero Non-Compete Agreement, she would (i) preserve the confidentiality of The Gordian Group's information; (ii) refrain from competing with The Gordian Group for a seven-year period; (iv) refrain from soliciting customers and employees of The Gordian Group for a seven-year period; (v) refrain from interfering with any of The Gordian Group's business relationship; (vi) and agree to submit to the jurisdiction of the Courts of New York.

54. Specifically, the Romero Non-Compete Agreement provides, in pertinent part, as follows:

> *1(c). "<u>Term</u>" means the period commencing on the date of this Agreement and ending on the 7 year anniversary of the date of this Agreement; provided, however, that if the Restricted Party's employment with the Company or any of its Subsidiaries is terminated (i) by the Company or any of its Subsidiaries without Cause, or (ii) by the Restricted Party with Good Reason, then the "Term" shall mean the period commencing on the date of this Agreement and ending on the 4 year anniversary of the date of this Agreement.*

###

> 2. *Non-Competition, Non-Solicitation and Non-Hire Covenants.*
>
> *(a) During the Term, no Restricted Party shall, directly or indirectly (1) own any interest in, manage, control, participate in (whether as an officer, director, employee, partner, agent, consultant, representative or otherwise), (ii) render services to any Person or (iii) in any manner engage in any activity or enterprise, in either case, competing with the Business in the Restricted Territory…*
>
> *(b) During the Term, no Restricted Party shall, directly or indirectly, do any of the following: (i) solicit the employment of any employee of TGG Sub or any of its Subsidiaries as of the date of this Agreement (after giving effect to the consummation of the Acquisition) or any employee who was employed by TGG Sub or any of the Subsidiaries for any type of employment within the six-month period prior to the date of this Agreement…*
>
> *(c) Each Restricted Party acknowledges and agrees that: (1) the Business has been and shall be conducted in the Restricted Territory; (2) as applicable, such Restricted Party's (A) knowledge of TGG Sub's and its Subsidiaries' operations and the Business, (B) rendering of services in the Business as a director, manager, officer, employee, equityholder or consultant of TGG Sub or any of its Subsidiaries, (C) financial resources and (D) customer contacts in the Business would permit such Restricted Party, but for the non-compete, non-solicitation, non-hire and confidentiality covenants in this Agreement, to unfairly compete with the Business; and, (3) the geographical restrictions and the length of the non-competition; non-solicitation and non-hire periods are reasonable and narrowly drawn to impose no greater restraint than is necessary to protect the goodwill of TGG Sub and its Subsidiaries (after giving effect to the consummation of the Acquisition).*
>
> 3. *Confidential Information. From and after the date of this Agreement, each Restricted Party agrees not to disclose or use at any time (and to cause each of its Affiliates not to use or disclose at any time) any confidential or proprietary information of TGG Sub, TGGand its Subsidiaries, except for disclosures made in the course of any Action arising under in connection with the Purchase Agreement or any other Transaction Document or the transactions contemplated thereby. Subject to the foregoing, each Restricted Party further agrees to take all commercially reasonable steps (and to cause each of its Affiliates to take all commercially reasonable steps) to safeguard such information so*

> *disclosed and to protect it against unauthorized disclosure, misuse, espionage, loss and theft…*
>
> ###
>
> *4. (a) Remedies. In the event of a breach of this Agreement by the applicable Restricted Party, TGG Ultimate shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations hereunder, without the necessity of posting a bond or other security. Without limiting the generality of the foregoing, TGG Ultimate and its Subsidiaries shall have the following rights and remedies against the applicable Restricted Party, each of which shall be independent of the others and severally enforceable: the right and remedy to have the restrictive covenants in the Agreement specifically enforced against the applicable Restricted Party, it being agreed by each Restricted Party that any breach or threatened breach by a Restricted Party of this Agreement may cause irreparable injury to each of TGG Ultimate or any of its Subsidiaries and that money damages may not provide an adequate remedy to TGG Ultimate or any of its Subsidiaries.*

*See* Exhibit C.

## IX. ROMERO GAINS ACCESS TO CONFIDENTIAL AND PROPRIETARY INFORMATION

55. In her role as an Account Manager, Romero was privy to The Gordian Group's customer list.

56. In fact, Romero regularly received an updated list of all The Gordian Group's customers and prospects to aid in her role of selling to, and providing services and products to, these businesses.

57. Romero also had access to The Gordian Group's proprietary and confidential sales and services materials meant to help The Gordian Group sell its products and to market its services.

58. In addition, Romero received and used The Gordian Group's sales and other proprietary materials designed to educate customers and prospective customers on The Gordian Group's products and services.

59. The trade secrets to which Romero was privy during heremployment are trade secrets from which The Gordian Group derives value.

## X. ROMERO TERMINATES EMPLOYMENT WITH THE GORDIAN GROUP

60. On or about June 30, 2016, Romero terminated her employment with The Gordian Group, without providing any notice.

61. Prior to this termination, Romero downloaded a substantial amount of The Gordian Group's proprietary information, including The Gordian Group's financials and client action plans.

62. Romero did not seek, or obtain, the consent of The Gordian Group to download The Gordian Group's proprietary information.

63. Prior to her termination, Romero represented through various agreements that she would not be competing with, soliciting employees from or taking the proprietary information of The Gordian Group.

## XI. THE GORDIAN GROUP HIRES MARTIN GARCIA, AND HE AGREES TO POST-EMPLOYMENT RESTRICTIONS

64. On or about January 8, 2008, The Gordian Group hired Garcia to work as an employee with the title, "Account Manager."

65. In October 2012, The Gordian Group employees were given the opportunity to purchase shares in TGG Ultimate Holdings by rolling over cash bonus payments due to the employees in connection with the sale of TGG Sub to TGG Holdings. In connection with, and as a condition of, the opportunity to purchase shares in TGG Ultimate Holdings, Garcia entered into

a series of agreements that, among other things, protected The Gordian Group's confidential information to which Garcia was made privy and imposed restrictions on Garcia's ability to compete with The Gordian Group, and its affiliated entities, and to solicit The Gordian Group's customers, prospects, and employees during and following his employment.

66. On or about October 30, 2012, Garcia executed a "Non-Competition, Non-Solicitation, Non-Hire and Confidentiality Agreement" (the "Garcia Non-Compete Agreement"). The Garcia Non-Compete Agreement is attached hereto as Exhibit D.

67. In consideration for signing the Non-Compete Agreement, Garcia was given the option, and exercised such option, to purchase stock in a private company in which he otherwise would not have been able to purchase stock.

68. Among other things, Garcia agreed, by way of the Garcia Non-Compete Agreement, he would (i) preserve the confidentiality of The Gordian Group's information; (ii) refrain from competing with The Gordian Group for a seven-year period; (iv) refrain from soliciting customers and employees of The Gordian Group for a seven-year period; (v) refrain from interfering with any of The Gordian Group's business relationship; (vi) and agree to submit to the jurisdiction of the Courts of New York.

69. Specifically, the Garcia Non-Compete Agreement provides, in pertinent part, as follows:

> *1(c). "<u>Term</u>" means the period commencing on the date of this Agreement and ending on the 7 year anniversary of the date of this Agreement; provided, however, that if the Restricted Party's employment with the Company or any of its Subsidiaries is terminated (i) by the Company or any of its Subsidiaries without Cause, or (ii) by the Restricted Party with Good Reason, then the "Term" shall mean the period commencing on the date of this Agreement and ending on the 4 year anniversary of the date of this Agreement.*

###

*2. <u>Non-Competition, Non-Solicitation and Non-Hire Covenants.</u>*

*(a) During the Term, no Restricted Party shall, directly or indirectly (1) own any interest in, manage, control, participate in (whether as an officer, director, employee, partner, agent, consultant, representative or otherwise), (ii) render services to any Person or (iii) in any manner engage in any activity or enterprise, in either case, competing with the Business in the Restricted Territory...*

*(b) During the Term, no Restricted Party shall, directly or indirectly, do any of the following: (i) solicit the employment of any employee of TGG Sub or any of its Subsidiaries as of the date of this Agreement (after giving effect to the consummation of the Acquisition) or any employee who was employed by TGG Sub or any of the Subsidiaries for any type of employment within the six-month period prior to the date of this Agreement...*

*(c) Each Restricted Party acknowledges and agrees that: (1) the Business has been and shall be conducted in the Restricted Territory; (2) as applicable, such Restricted Party's (A) knowledge of TGG Sub's and its Subsidiaries' operations and the Business, (B) rendering of services in the Business as a director, manager, officer, employee, equityholder or consultant of TGG Sub or any of its Subsidiaries, (C) financial resources and (D) customer contacts in the Business would permit such Restricted Party, but for the non-compete, non-solicitation, non-hire and confidentiality covenants in this Agreement, to unfairly compete with the Business; and, (3) the geographical restrictions and the length of the non-competition; non-solicitation and non-hire periods are reasonable and narrowly drawn to impose no greater restraint than is necessary to protect the goodwill of TGG Sub and its Subsidiaries (after giving effect to the consummation of the Acquisition).*

*3. <u>Confidential Information</u>. From and after the date of this Agreement, each Restricted Party agrees not to disclose or use at any time (and to cause each of its Affiliates not to use or disclose at any time) any confidential or proprietary information of TGG Sub, TGGand its Subsidiaries, except for disclosures made in the course of any Action arising under in connection with the Purchase Agreement or any other Transaction Document or the transactions contemplated thereby. Subject to the foregoing, each Restricted Party further agrees to take all commercially reasonable steps (and to cause each of its Affiliates to take all commercially reasonable steps) to safeguard such information so*

> *disclosed and to protect it against unauthorized disclosure, misuse, espionage, loss and theft...*
>
> ###
>
> *4. (a) Remedies. In the event of a breach of this Agreement by the applicable Restricted Party, TGG Ultimate shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief to prevent the violation of any obligations hereunder, without the necessity of posting a bond or other security. Without limiting the generality of the foregoing, TGG Ultimate and its Subsidiaries shall have the following rights and remedies against the applicable Restricted Party, each of which shall be independent of the others and severally enforceable: the right and remedy to have the restrictive covenants in the Agreement specifically enforced against the applicable Restricted Party, it being agreed by each Restricted Party that any breach or threatened breach by a Restricted Party of this Agreement may cause irreparable injury to each of TGG Ultimate or any of its Subsidiaries and that money damages may not provide an adequate remedy to TGG Ultimate or any of its Subsidiaries.*

*See* Exhibit D.

## XII. GARCIA GAINS ACCESS TO CONFIDENTIAL AND PROPRIETARY INFORMATION

70. In his role as an Account Manager, Garcia was privy to The Gordian Group's customer list.

71. In fact, Garcia regularly received an updated list of all The Gordian Group's customers and prospects to aid in his role of selling to, and providing services and products to, these businesses.

72. Garcia also had access to The Gordian Group's proprietary and confidential sales and services materials meant to help The Gordian Group sell its products and to market its services.

73. In addition, Garcia received and used The Gordian Group's sales and other proprietary materials designed to educate customers and prospective customers on The Gordian Group's products and services.

74. The trade secrets to which Garcia was privy during his employment are trade secrets from which The Gordian Group derives value.

## XIII. GARCIA TERMINATES EMPLOYMENT WITH THE GORDIAN GROUP

75. On or about June 30, 2016, Garcia terminated his employment with The Gordian Group, without providing any notice.

76. Prior to this termination, Garcia downloaded a substantial amount of The Gordian Group's proprietary information, including The Gordian Group's financials and client action plans.

77. Garcia did not seek, or obtain, the consent of The Gordian Group to download The Gordian Group's proprietary information.

78. Prior to this termination, Garcia represented through his employment agreements that he would not be competing with, soliciting employees from or taking the proprietary information of The Gordian Group.

## XIV. HOLLETT, LEDEZMA, ROMERO AND GARCIA BREACH THEIR NON-COMPETE

79. In or about 2016, Defendants began to conspire regarding competing against The Gordian Group, as well as soliciting The Gordian Group's employees and customers, and using The Gordian Group's proprietary job order contracting information without the consent of The Gordian Group.

80. In or about March 2016, Hollett formed JAMB Services, Inc. ("JAMB") with his spouse, Jenell Hollett.

81. Jenell Hollett is listed as the founder and principal of JAMB for the purpose of claiming that JAMB is a woman-owned business, despite the fact that Joseph Hollett is the individual with experience in job order contracting, while Jenell Hollett has little-to-no construction experience.

82. According to Jenell Hollett's LinkedIn page, her work experience includes being an "Author and Speaker", including two novels titled "What I Learned From Men" and "The Pain Behind the Portrait", as well as purported "experience in residential construction", although there is no such experience listed under her "Experience" section.

83. Despite the information provided under the Experience and Skills section of her LinkedIn page, Jenell Hollett lists herself as "founder of JAMB Services, Inc." *See* Jenell Hollett's LinkedIn page, attached hereto as Exhibit E.

84. Joseph Hollett is identified on his LinkedIn page as the "Chief Operating Officer for JAMB Services, Inc." *See* Joseph Hollett's LinkedIn page, attached hereto as Exhibit F.

85. Both Joseph Hollett and Jenell Hollett's LinkedIn pages describe JAMB as a "company providing Job Order Contracting (JOC) services."

86. Upon information and belief, Hollett has been soliciting the other Defendants to work for JAMB, and to otherwise solicit other employees of The Gordian Group to do the same.

87. Upon information and belief, Defendants are soliciting current and prospective customers of The Gordian Group to become customers of JAMB.

88. Upon information and belief, prior to Romero and Garcia advising The Gordian Group that they were terminating their employment with The Gordian Group, they downloaded proprietary information and trade secrets of The Gordian Group, including customer lists, client action plans and information on job order contracting data, pricing and methods.

89. Upon further information and belief, Romero and Garcia intend to share, or have shared, this proprietary information with the other Defendants and are using, and intend to use, this proprietary information to compete with The Gordian Group and otherwise gain a competitive advantage.

90. Defendants have violated their respective Non-Competition, Non-Solicitation, Non-Hire and Confidentiality Agreements with The Gordian Group.

91. Defendants have filed an action in California, in violation of the jurisdiction and venue clauses of their Non-Competition, Non-Solicitation, Non-Hire and Confidentiality Agreements with The Gordian Group.

92. In filing the California Action, Defendants have stated their intent to violate their Non-Compete Agreements.

93. In contravention of the forum selection clauses in their Non-Compete Agreements, Defendants attempted to forum shop by initiating their action in a jurisdiction that disfavors non-compete agreements.

94. In summary, in violation of their common law and contractual duties, Defendants engaged in competitive activities in violation of their Non-Compete Agreements, remain affiliated with a business that is interfering with The Gordian Group's relationships, maintain possession of The Gordian Group's trade secrets, and are jeopardizing The Gordian Group's current business relationships.

95. As a result of the above-described conduct of Defendants, The Gordian Group suffered, and continues to suffer, significant damages that are not compensable by way of monetary damages alone, including, without limitation, lost profits, lost opportunities, and lost business.

96. The damages The Gordian Group is suffering include damages that are immediate and irreparable.

97. If Defendants continue to compete with The Gordian Group, solicit The Gordian Group's employees and possess and potentially use The Gordian Group's trade secrets and other confidential and proprietary information, The Gordian Group would suffer catastrophic and irreparable damages that would cause it to downsize and would threaten its future.

**COUNT I — BREACH OF CONTRACT**

98. Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint as if same were set forth at length herein.

99. The Non-Competition, Non-Solicitation, Non-Hire and Confidentiality Agreements that Defendants entered into with The Gordian Group were fully performed by The Gordian Group.

100. As set forth above, the Non-Competition, Non-Solicitation, Non-Hire and Confidentiality Agreements that Defendants entered into with The Gordian Group imposed non-competition, non-solicitation, and confidentiality duties on Defendants that extended throughout their employment and post-employment.

101. By engaging in the above-described conduct, including, without limitation, by engaging in competitive activities, soliciting employees of The Gordian Group, soliciting customers of The Gordian Group, and using The Gordian Group's proprietary information and trade secrets, Defendants breached their duties to The Gordian Group.

102. As a result of these breaches, Plaintiffs have suffered, and will continue to suffer, substantial damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor and request an award of compensatory damages, including disgorgement of profits and recompense for harm done to Plaintiffs; consequential damages; punitive damages, permanent injunctive relief requiring Defendants to abide by their post-employment obligations, including prohibiting Defendants from (i) soliciting, or performing services for, any The Gordian Group customer or prospective customer; and (ii) soliciting/hiring The Gordian Group employees, and (iii) using, retaining, or disclosing The Gordian Group's confidential information, proprietary information, and other trade secrets; attorneys' fees and costs; and such other relief as the court deems just and equitable.

**COUNT II — BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

103. Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint as if same were set forth at length herein.

104. As set forth above, the Non-Competition, Non-Solicitation, Non-Hire and Confidentiality Agreements imposed upon Defendants non-competition, non-solicitation, and confidentiality duties and a duty of good faith and fair dealing.

105. By engaging in the above-described conduct, including, without limitation, by engaging in competitive activities, Defendants breached their contractual duties of good faith and fair dealing.

106. As a result of these breaches, Plaintiffs have suffered, and will continue to suffer, substantial damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor and request an award of compensatory damages, including disgorgement of profits and recompense for harm done to Plaintiffs; consequential damages; punitive damages, permanent injunctive relief requiring

Defendants to abide by their post-employment obligations, including prohibiting Defendants from (i) performing services for any customer or prospective customer of The Gordian Group; and (ii) soliciting/hiring The Gordian Group employees, and (iii) using, retaining, or disclosing The Gordian Group's confidential information, proprietary information, and other trade secrets; attorneys' fees and costs; and such other relief as the court deems just and equitable.

## COUNT III — TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

107. Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint as if same were set forth at length herein.

108. The Gordian Group derives actual and prospective economic advantages from its customer relationships.

109. By engaging in the above-described conduct, including, without limitation, by engaging in competitive activities, soliciting/hiring The Gordian Group's employees, and/or retaining and using The Gordian Group's trade secrets, Defendants unjustifiably and tortiously interfered with the customer relationships from which The Gordian Group derives actual and prospective economic advantages.

110. As a result of these breaches, Plaintiffs have suffered, and will continue to suffer, substantial damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor and request an award of compensatory damages, including disgorgement of profits and recompense for harm done to Plaintiffs; consequential damages; punitive damages, permanent injunctive relief requiring Defendants to abide by their post-employment obligations, including prohibiting Defendants from (i) performing services for any The Gordian Group customer or prospective customer; and (ii) soliciting/hiring The Gordian Group employees, and (iii) using, retaining, or disclosing The

Gordian Group's confidential information, proprietary information, and other trade secrets; attorneys' fees and costs; and such other relief as the court deems just and equitable.

## COUNT IV —TRADE SECRET MISAPPROPRIATION

111. Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint as if same were set forth at length herein.

112. The Gordian Group derives independent economic value from its trade secrets (which include its regularly-used customer and prospect lists and the value-added job order contracting materials and data The Gordian Group provides to its customers), from them not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use. These trade secrets constitute trade secrets under New York's common law definition of trade secrets.

113. The Gordian Group's trade secrets have been the subject of efforts that are reasonable under the circumstances to maintain their secrecy, including, without limitation, locking trade secrets in a file cabinet, requiring key employees to enter into non-competition agreements, shredding documents, and password protecting electronic files.

114. These trade secrets are subject to protection.

115. By engaging in the above-described activities, Defendants, though the use of improper means, misappropriated The Gordian Group's trade secrets.

116. Plaintiffs suffered damages as a result.

117. Moreover, injunctive relief is appropriate and necessary to prevent irreparable harm to Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment in their favor and request an award of compensatory damages, including disgorgement of profits and recompense for harm done to

Plaintiffs; consequential damages; punitive damages, permanent injunctive relief requiring Defendants to abide by their post-employment obligations, including prohibiting Defendants from (i) performing services for any customer or prospective customer of The Gordian Group; and (ii) soliciting/hiring The Gordian Group employees, and (iii) using, retaining, or disclosing The Gordian Group's confidential information, proprietary information, and other trade secrets; attorneys' fees and costs; and such other relief as the court deems just and equitable.

## PRAYER FOR RELIEF

**Wherefore**, Plaintiffs demand judgment against Defendants, granting them:

(a) Preliminary and permanent injunctive relief enjoining Defendants from:

1. Using, retaining, or disclosing The Gordian Group's confidential information, proprietary information, and other trade secrets for their own benefit;

2. Using or sharing any The Gordian Group property (as defined in the Restrictive Covenants in the Employment Agreements) and shall return same to The Gordian Group;

3. For the remainder of the Terms of the Agreements, directly or indirectly, owning any interest in, managing, controlling, participating in (whether as an officer, director, employee, partner, agent, consultant, representative or otherwise), rendering services to any person/entity or in any manner engaging in any activity or enterprise, in either case, competing with The Gordian Group, including, but not limited to JAMB;

4. For the remainder of Terms of their Agreements, directly or indirectly contacting any person, client, or customer of The Gordian Group or any potential client or customer they solicited or contacted or The Gordian Group had or was planning to solicit or contact;

5. For the remainder of the Terms of their Agreements, directly or indirectly:

(A) soliciting the employment, consulting or other services of or hire or retain or otherwise induce any employees to leave The Gordian Group's employment or to breach an employment agreement or any other agreement with The Gordian Group; or

(B) soliciting any contractor or vendor to The Gordian Group who provides services or products to The Gordian Group to stop providing his or her services or products to The Gordian Group in any respect; or

(C) inducing or attempting to induce any supplier, licensee or other business relation of The Gordian Group to cease doing business with The Gordian Group or in any way interfere with the business relationship with The Gordian Group.

(b) Preliminary and permanent injunctive relief ordering Defendants to:

1. Disclose the location and identity of all of The Gordian Group's proprietary information and trade secrets in their possession, custody and/or control.

2. Return to The Gordian Group all of The Gordian Group's proprietary information and trade secrets in their possession, custody and/or control.

3. Confirm, under oath, that they have returned all The Gordian Group's proprietary information and trade secrets in their possession, custody and/or control and destroyed any copies.

(c) An award of compensatory, punitive, statutory, and/or treble damages, costs and disbursements in this action, including reasonable attorneys' fees; and such other, further, and different relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

**FLASTER/GREENBERG P.C.**

Dated: August 8, 2016

Jeffrey A. Cohen, Esquire
Commerce Center
1810 Chapel Avenue West
Cherry Hill, NJ 08002
(856) 661-1900 - Phone
(856) 661-1919 – Facsimile
jeff.cohen@flastergreenberg.com
*Attorneys for Plaintiffs, TGG Ultimate Holdings, Inc., TGG Holdings, Inc., TGG Sub Inc., and The Gordian Group, Inc.*

**VERIFICATION**

STATE OF ~~NEW YORK~~ California :
SS
COUNTY OF ~~NEW YORK~~ Alameda :

Randy Horn, of full age, being duly sworn according to law, upon his oath deposes and says:

I am employed as Western Regional Director for The Gordian Group, and am familiar with the facts referenced in the Verified Complaint.

I have reviewed the Verified Complaint, and based upon my review of the allegations and attached documents, in addition to my personal involvement with the events giving rise to this litigation, the factual matters contained herein are true to the best of my knowledge.

Randy Horn

Sworn and subscribed to before

me on this 5 day of August, 2016.

See CA Jurat

ARRON W. STANLEY
Commission No. 2156061
NOTARY PUBLIC-CALIFORNIA
ALAMEDA COUNTY
My Comm. Expires JULY 4, 2020

# JURAT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of Alameda

Subscribed and sworn to (or affirmed) before me on this 5 day of Aug.,

2016 by Randy Horn,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

ARRON W. STANLEY
Commission No. 2156061
NOTARY PUBLIC-CALIFORNIA
ALAMEDA COUNTY
My Comm. Expires JULY 4, 2020
NCC1

[signature] (Seal)
Signature

## OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

(Title or description of attached document)

(Title or description of attached document continued)

Number of Pages _____ Document Date__________

Additional information

## INSTRUCTIONS

*The wording of all Jurats completed in California after January 1, 2015 must be in the form as set forth within this Jurat. There are no exceptions. If a Jurat to be completed does not follow this form, the notary must correct the verbiage by using a jurat stamp containing the correct wording or attaching a separate jurat form such as this one with does contain the proper wording. In addition, the notary must require an oath or affirmation from the document signer regarding the truthfulness of the contents of the document. The document must be signed AFTER the oath or affirmation. If the document was previously signed, it must be re-signed in front of the notary public during the jurat process.*

- State and county information must be the state and county where the document signer(s) personally appeared before the notary public.
- Date of notarization must be the date the signer(s) personally appeared which must also be the same date the jurat process is completed.
- Print the name(s) of the document signer(s) who personally appear at the time of notarization.
- Signature of the notary public must match the signature on file with the office of the county clerk.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different jurat form.
  - ❖ Additional information Is not required but could help to ensure this jurat is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
- Securely attach this document to the signed document with a staple.